**UNITED STATES of America,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**Jerry L. KING,**
**Defendant-Appellant-Cross-Appellee.**

**Nos. 977, 1188, Dockets**
**84–1409, 84–1437.**

United States Court of Appeals,
Second Circuit.

Argued April 11, 1985.
Decided May 20, 1985.

Rodney O. Personius, Asst. U.S. Atty., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Buffalo, N.Y., on brief), for plaintiff-appellee-cross-appellant.

Mark J. Mahoney, Buffalo, N.Y. (Diebold, Bermingham, Gorman, Brown &

Cook, P.C., Buffalo, N.Y., on brief), for defendant-appellant-cross-appellee.

Before MANSFIELD, KEARSE and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Jerry L. King appeals from a judgment of the United States District Court for the Western District of New York, entered after a jury trial before John T. Elfvin, *Judge*, in Buffalo, New York, convicting him of conspiring to possess and distribute counterfeit money in violation of 18 U.S.C. § 371 (1982). King contends that he should be granted a new trial because the district court erroneously denied him the right to review the transcript of certain testimony before the grand jury that indicted him and improperly refused to grant a continuance to permit him to bring a favorable witness to the trial. The government cross-appeals, challenging an order of Judge Elfvin that vacated the jury's verdict against King on a charge of tampering with a witness in violation of 18 U.S.C. § 1512 (1982) on the ground that the facts proven by the government were not within the scope of § 1512. For the reasons below, we affirm the judgment and order of the district court.

## I. BACKGROUND

King was charged in an April 1984 indictment on one count of conspiring to deal in and utter counterfeit money, in violation of 18 U.S.C. § 371; two counts of transferring counterfeit money, in violation of 18 U.S.C. 473 (1982); and one count of misleading a witness, in violation of 18 U.S.C. § 1512. On July 23, 1984, jury selection was scheduled for August 28, 1984, and thereafter commencement of trial was scheduled for October 1, 1984.

During the course of the investigation of the events that led to the indictment, King's brother, Dennis King ("Dennis"), had appeared as a witness before the grand jury and testified that King was not a knowing participant in the counterfeit currency transactions. After King was indict-

ed, the substance of Dennis's exculpatory testimony was communicated by the Assistant United States Attorney to King's attorney on two occasions: first to King's original attorney in May 1984, four days after King's arraignment, and then to King's newly substituted trial counsel on August 1, 1984. By the time of King's trial, Dennis was incarcerated in federal prison at Lewisburg, Pennsylvania.

On September 27, 1984, two court-days before the scheduled start of trial, King moved for the disclosure of Dennis's grand jury testimony and for a two or three week adjournment of the trial date. King's counsel stated that he wanted to review Dennis's grand jury testimony because he had been informed by Dennis's attorney that that testimony was exculpatory of King. The government pointed out that King's attorneys had previously been advised by the government of the exculpatory nature of Dennis's testimony, and it opposed King's motion for production of the grand jury transcript on the ground that it believed that Dennis's testimony had been perjurious and it did not wish to facilitate the continuation of his fabrications. The district court reviewed Dennis's grand jury testimony *in camera*, informed King that Dennis had testified that King was not a knowing participant in the counterfeit currency transactions, noted that Dennis had long been available to King for purposes of consultation, and denied the motion for production of the grand jury transcript.

The grounds advanced for King's requested adjournment were (1) that King had become aware of certain "new leads" that might lead to exculpatory evidence, and (2) that King wanted his brother, Dennis, "to be present or at least available at trial." The U.S. Marshals Office had advised King that it would require approximately two weeks' notice to obtain approval for Dennis to be brought from Lewisburg to the trial in Buffalo. The court was unpersuaded by King's proffered reason for not having discovered his new leads earlier, and no reason was offered for King's not having moved earlier to have

Dennis brought to trial. King's counsel admitted that Dennis had not been unavailable for consultation. The court denied the motion for an adjournment. King did not ask the court to have Dennis produced on an expedited basis.

At trial, the jury found King guilty on the conspiracy count and the witness tampering count, and acquitted him on the two counts charging him with transfers of counterfeit money. Judge Elfvin vacated the guilty verdict on the witness tampering count, finding that the facts proven by the government, which we discuss in Part II.B. below, did not bring King's actions within § 1512. King was sentenced to imprisonment for one year and one day on the conspiracy count. This appeal and the cross-appeal followed.

## II. DISCUSSION

### A. *The Appeal*

King contends that the district court abused its discretion in denying his motion for a continuance to permit Dennis to be brought to testify and in refusing to grant him access to the grand jury transcript. We find no merit in these contentions.

 A motion for an adjournment of the scheduled start of trial is addressed to the sound discretion of the trial judge. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964); *Avery v. Alabama*, 308 U.S. 444, 450, 60 S.Ct. 321, 324, 84 L.Ed. 377 (1940); *United States v. Cicale*, 691 F.2d 95, 106 (2d Cir. 1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). To show abuse of that discretion, the defendant must demonstrate that the court's denial of a continuance was arbitrary and substantially impaired his defense. *United States v. Bein*, 728 F.2d 107, 114 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 135, 83 L.Ed.2d 75 (1984); *United States v. Ellenbogen*, 365 F.2d 982, 985 (2d Cir.1966), *cert. denied*, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967).

 Here we can hardly regard the district court's action as arbitrary, and we conclude that any detriment suffered by King resulted from his own dilatory conduct and not from the court's ruling. King was advised more than four months in advance of trial that his brother's grand jury testimony had sought to exonerate him in the counterfeit money transactions. Yet he waited until two court-days before trial to suggest to the district court that he wanted Dennis to appear as a trial witness. Such tactics provide no basis for a ruling that the district court abused its discretion in denying a continuance to permit the witness to be brought to trial.

 We are unpersuaded by King's attempt to cast this issue as a violation of his Sixth Amendment right to compulsory process to obtain witnesses in his defense. There seems to be no doubt that King would have been able to secure Dennis's presence had he simply requested it in timely fashion. Further, it is possible that had King requested, even at the late date of his continuance motion, that the court expedite the production of Dennis so that he might appear in time for trial, Dennis's presence might have been procured. That King made neither a timely request for Dennis's production nor an eleventh hour request for his production on an expedited basis belies his claim that his fundamental rights were violated.

 Nor do we find merit in the claim that King should have been given the transcript of Dennis's grand jury testimony. We pause to note that we are unimpressed with the government's stated reason for opposing the motion, *i.e.*, that the government did not want Dennis to have access to the transcript because it believed his prior testimony had been perjurious. Incredulity is not a proper basis for denial of access to grand jury materials.

 Nonetheless, the court's ruling was not inappropriate. King had been advised in May and August that Dennis's testimony was exculpatory of King, and King's counsel conceded that Dennis would have been available for consultation if counsel had wished to speak with him. Thus, this was

not a case in which King lacked either information as to the contents of the transcript or access to the person who gave the testimony. The district court's denial of the motion for production of the transcript was therefore not an abuse of discretion. *See United States v. Natale,* 526 F.2d 1160, 1171 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976) (denial of grand jury testimony upheld where witness had been continually available for interviewing).

## B. *The Cross-Appeal*

Count 4 of the indictment charged that from approximately July 26, 1983, through August 4, 1983, King had, in violation of 18 U.S.C. § 1512, "knowingly engage[d] in misleading conduct toward another person" by making false statements to, and intentionally concealing material facts from, one Frank S. Orgovan, Jr., for the purpose of hindering and preventing the disclosure to law enforcement agents of King's participation in the counterfeiting offenses. The jury found King guilty on this count, but the trial court vacated the verdict on the ground that the facts proven did not amount to a violation of § 1512. The government cross-appeals from this decision. We agree with the district court's interpretation.

Section 1512 provides, in pertinent part, as follows:

(a) *Whoever knowingly* uses intimidation or physical force, or threatens another person, or attempts to do so, or *engages in misleading conduct toward another person,* with intent to—

(1) influence the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony … from an official proceeding; [or]

. . . .

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense…

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

(Emphasis added.) The evidence on count 4, viewed in the light most favorable to the government, painted the following picture. Orgovan was an employee of King. In mid-June 1983, King informed Orgovan that he could obtain counterfeit money and that he would contact Orgovan after making a trip to Syracuse, New York. On July 16, five days after a meeting in Syracuse at which King paid $5,000 for $30,000 in counterfeit money, he met again with Orgovan in Buffalo and gave Orgovan five counterfeit $20 federal reserve notes, describing the quality as "good" and stating that he had passed some of the notes in a local shopping mall. On July 17, King gave Orgovan $2,700 in counterfeit currency in a white bag that was eventually recovered by law enforcement agents; King's fingerprint was found inside the bag. In supplying the counterfeit $2,700 to Orgovan, King cautioned that Orgovan should not identify King as the source of the counterfeit money.

In late July 1983, Orgovan and Dennis were arrested and charged with counterfeiting-related offenses. While Orgovan was still in custody, he telephoned his girl friend, Gale Hewson, and told her to contact King immediately. Hewson testified that she did so and that King's response was to tell her to destroy or get rid of the money in any way she could.

Orgovan eventually agreed to cooperate with the government and implicated King in the counterfeit currency transactions. He met with King on August 2 and August 4, wearing a recording device. The essence of these meetings was King's solicitation of Orgovan's cooperation in concealing King's complicity in the counterfeit currency transfers. King repeatedly observed that he and Orgovan could trust only each other; King gave assurances that if Orgovan remained silent, his silence would be finan-

cially rewarded; and King urged that if Orgovan had to implicate someone, he should implicate King's brother, Dennis, who had already been implicated by others. King advised that if Hewson were asked, she should say she knew nothing about the counterfeit money.

In an order reported at 597 F.Supp. 1228 (1984), Judge Elfvin vacated the jury's verdict finding King guilty of a violation of § 1512 because the evidence did not indicate that King had misled Orgovan in any way. Rather, "King, simply and flat-out, tried to persuade Orgovan to lie" to mislead the government. *Id.* at 1231. The court ruled that although the conduct actually proven might amount to an obstruction of justice in violation of 18 U.S.C. § 1503 (1982), it was not within the ambit of § 1512. This interpretation of § 1512 is supported both by the language of the statute and by its legislative history.

■ By its terms, § 1512 does not purport to reach all forms of tampering with a witness, but only tampering by specified means, *i.e.*, by use or attempted use of "intimidation" or "physical force" or "threat[ ]" or by engaging in "misleading conduct toward another person." The indictment charged that King had engaged in misleading conduct toward Orgovan, but the evidence did not support that charge. The proof was plain that Orgovan was involved in the scheme as early as mid-June; he knowingly received counterfeit money from King on two occasions; he had discussions with King as to the counterfeit nature of the bills; and when he was arrested, he sent word to King of that fact. No rational juror could conclude from the August 2 and 4 conversations—in which King urged Orgovan that the two should stick together, that Orgovan should not implicate King but only Dennis, and that Orgovan's silence would be rewarded financially—that Orgovan was in any way misled. Since the only allegation in the indictment as to the means by which King induced Orgovan to withhold testimony was that King misled Orgovan, and since the evidence failed totally to support any inference that Orgovan was, or even could have been, misled, the conduct proven by the government was not within the terms of § 1512. *See United States v. Lester,* 749 F.2d 1288, 1293–95 (9th Cir.1984); *United States v. Beatty,* 587 F.Supp. 1325, 1331–33 (E.D.N.Y.1984).

■ The government contends that, notwithstanding the actual language of § 1512, Congress meant for § 1512 to reach conduct that was not misleading to the person at whom it was directed but was intended to mislead the government. The starting point for its argument is that such conduct was previously within the ambit of 18 U.S.C. § 1510 (1976), which made unlawful "willful[ ] endeavors by means of ... misrepresentation ... to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator." *See United States v. St. Clair,* 552 F.2d 57, 58 (2d Cir.) ("§ 1510 is violated whenever an individual induces or attempts to induce another person to make a material misrepresentation to a criminal investigator."), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977); *id.* at 59 ("[S]oliciting misrepresentations by potential witnesses is illegal."); *see also* legislative history to § 1510, H.R. Rep. No. 658, 90th Cong., 1st Sess. 3, *reprinted in* 1967 U.S.Code Cong. & Ad. News 1760, 1762 ("[T]he actual procurement by a party of another party's misrepresentation or silence to a Federal investigator would be covered even though such procurement was not achieved by any misrepresentation."). The government points out that in enacting § 1512 as part of the Victim and Witness Protection Act of 1982 (the "Act"), Pub.L. No. 97–291, 96 Stat. 1248, Congress amended § 1510 to delete references to conduct consisting of "misrepresentation, intimidation, or force or threats thereof," and it argues that this deletion of "misrepresentation," etc., reflected Congress's intention that the deleted portions of former § 1510 be covered by the new § 1512. The government supports its view of Congress's intention by refer-

ring to the floor statement of Representative Rodino, Chairman of the House of Representatives' Committee on the Judiciary, in which, in a section-by-section analysis of the proposed legislation, he characterized the changes in § 1510 as "technical" and stated that the bill "delete[d] language from section 1510 pertaining to informant intimidation and retaliation because the conduct dealt with by that language is covered in new sections 1512 and 1513." 128 Cong.Rec. H8205 (daily ed. Sept. 30, 1982). We are unpersuaded.

First, the passage just quoted and relied on by the government refers only to "intimidation and retaliation," not to other forms of witness tampering. This is a thin reed on which to build a case for an interpretation of § 1512 that transforms the words "misleading conduct toward another person ... to ... hinder ... [the government]" into "any conduct leading another person to mislead the government."

More importantly, the original bill that led to the enactment of the Act contained, in addition to the eventually enacted enumeration of specific types of conduct to be reached, a catchall section designed to reach any person who "corruptly, by threats of force, or by any threatening letter of communication, intentionally influences, obstructs, or impedes or attempts to influence, obstruct, or impede the ... enforcement and prosecution of federal law." S. 2420, 97th Cong., 2d Sess., sec. 201(a), § 1512(a)(3), 128 Cong.Rec. S11,439 (daily ed. Sept. 14, 1982). The Senate Judiciary Committee opined that the prevention of obstructions of justice could not be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses and stated that the residual section was not intended to be limited by the doctrine of ejusdem generis. S.Rep. No. 532, 97th Cong., 2d Sess. 18, *reprinted in* 1982 U.S. Code Cong. & Ad.News 2515, 2524. Thus, the Senate Report stated that the residual section was intended to reach, *inter alios*, "a person who induces another to remain silent or to give misleading information to a Federal law enforcement officer ... irrespective of whether he employed deception,

intimidation, threat, or force as to the person." *Id.* (footnote omitted). The residual section, however, was deleted from the Act as finally passed. We agree with the courts in *United States v. Lester* and *United States v. Beatty* that the legislative history of § 1512 does not suggest that Congress intended that section, as enacted, to reach modes of conduct other than those there enumerated.

■ Finally, we find unpersuasive the government's argument that, since King's conduct is punishable neither under § 1510, as amended, nor under § 1503 because there was no pending judicial proceeding at the time he sought to have Orgovan give false information, *see United States v. Vesich*, 724 F.2d 451, 454 (5th Cir.1984) (attempt to obstruct a criminal investigation or inquiry before a proceeding has been initiated is not within § 1503); *United States v. Fayer*, 573 F.2d 741, 745 (2d Cir.) ("Corrupt advice under 18 U.S.C. § 1503 must relate to an investigation by the grand jury, not the F.B.I."), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), the application of § 1512 according to its terms will allow conduct such as that proven here, *i.e.*, the nonmisleading, nonthreatening, nonintimidating attempt to have a person give false information to the government, to go unpunished. If there is such a lacuna in the legislative scheme, the proper remedy is not for the courts to distort the plain language of § 1512 but for Congress to enact legislation to close the gap.

CONCLUSION

The judgment and order of the district court are in all respects affirmed.